**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| COOPERATIVE REGIONS OF ORGANIC PRODUCER POOLS D/B/A/ CROPP COOPERATIVE,<br><br>          Plaintiff,<br><br>v.<br><br>BROOKE C. ROLLINS, in her official capacity as Secretary of Agriculture<br><br>AND<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE,<br><br>          Defendants. | Civil Action No. 26-cv-376 |

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND JUST COMPENSATION**

4935-4500-1375v.4 0123896-000001

Plaintiff Cooperative Regions of Organic Producer Pools dba CROPP Cooperative ("CROPP Cooperative" or "Plaintiff") hereby files this suit against Defendants Brooke C. Rollins, in her official capacity as Secretary of Agriculture, and the United States Department of Agriculture ("USDA") (collectively "Defendants") and alleges as follows:

## I.    INTRODUCTION

1.    CROPP Cooperative operates as an organic milk processor (called a "handler") meaning that it purchases organic milk from cooperative associations and independent dairy farmers (both called "producers"), which it then processes and packages for sale to consumers.

2.    Plaintiff challenges Defendant USDA's Federal Milk Marketing Orders ("FMMOs"), 7 C.F.R. §1000 *et seq.*, issued pursuant to the Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 608c(5) as constituting an unlawful taking without compensation, violating Due Process, and violating the Nondelegation Doctrine with respect to USDA certified organic milk.  The FMMOs provide no benefit to organic fluid milk processors like Plaintiff while compelling them to pay millions of dollars in subsidies for the benefit of other dairy product manufacturers and their dairy farmers.  Plaintiff's complaint pertains to the entirety of 7 C.F.R. Parts 1000 to 1131 (2025).

3.    Under FMMOs, every time organic milk processors like Plaintiff purchase organic milk from organic farmers (called "producers"), USDA compels the processors to divert a portion of what would otherwise be paid to the  farmer  to USDA's "producer settlement fund."  USDA then redistributes the producer settlement funds for the near-exclusive benefit of conventional (i.e., non-organic) handlers and farmers.

2

4.      USDA has established eleven marketing areas for the purpose of regulating the sale of milk, as shown in the map below.[1]  Each marketing area has its own producer settlement fund.



## 11 Federal Milk Marketing Order Areas

5.      The unjust and discriminatory treatment Plaintiff faces is no accident.  Under the structure created by the AMAA, proposed FMMOs must be approved by dairy farmers—but not by processors like Plaintiff—even though the FMMOs set both the minimum prices that processors must pay farmers for raw milk and the additional fees that they must pay to "producer settlement funds" for the benefit of farmers not supplying them milk.  For an organic fluid milk processor like Plaintiff, the effect is even worse because USDA uses the payments demanded by FMMOs

---

[1] Found at https://www.ams.usda.gov/sites/default/files/media/Federal%20Milk%20Marketing%20Orders%20Map.pdf.

3

overwhelmingly to benefit *conventional* dairy farmers, particularly those producing milk used for manufacturing other dairy products like cheese, yogurt, butter, and nonfat dry milk.

6.      Ostensibly, USDA defends the burdens this system imposes on processors like Plaintiff as justified under the authorizing statute to ensure uniform pricing designed to prevent "destructive competition" and provide an adequate supply of milk.  In reality, the system creates disorderly marketing for organic handlers and does not provide an adequate supply of organic raw milk in direct contravention of the AMAA's explicit directives.

7.      Plaintiff receives no benefit from the FMMOs because the FMMOs only advance the interests of the numerically superior conventional dairy farmers who improperly exercise delegated regulatory power to benefit themselves at Plaintiff's expense.

8.      In short, the adoption and enforcement of the FMMOs violates Plaintiff's Constitutional rights and represents unlawful agency action.  The Court should therefore declare the FMMOs invalid and unenforceable as applied to Plaintiff.

## II.      JURISDICTION, VENUE, EXHAUSTION, AND FINAL AGENCY ACTION

9.      This Court has jurisdiction pursuant to 7 U.S.C. § 608c(15)(B).

10.      On April 29, 2025, Plaintiff individually filed a petition with USDA pursuant to 7 U.S.C. § 608c(15)(A) (the "Petition").  **Exhibit 1**.  The Petition sought relief from the FMMOs applied to organic milk on multiple constitutional, Administrative Procedure Act ("APA"), and AMAA grounds.

11.      The applicable § 608c(15)(A) administrative review process includes two levels of administrative review within USDA—first before an Administrative Law Judge ("ALJ") and then before the Secretary, who has delegated such duties to the Judicial Officer for USDA ("J.O.") pursuant to the "Procedural Requirements Governing Proceedings on Petitions to Modify or To Be Exempted From Marketing Orders."  7 C.F.R. § 900 Subpart D.

4

12.     At the first level, by Order dated September 24, 2025 (**Exhibit 2**), the ALJ dismissed Plaintiff's Takings (Claim One), Due Process (Claim Two), and Nondelegation Doctrine (Claim Four) claims as being incapable of review by or on behalf of the agency.  Plaintiff timely appealed the ALJ's Order (**Exhibit 3**), and the J.O. upheld the ALJ's ruling by Order dated April 6, 2026 (**Exhibit 4**).  Plaintiff's AMAA, Administrative Procedure Act ("APA") and Equal Protection claims are still being adjudicated before the ALJ.  Plaintiff files this 7 U.S.C. § 608c(15)(B) action within the twenty days prescribed under the statute.

13.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701–06, and the United States Constitution.

14.     Plaintiff's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, the APA, 5 U.S.C. §§ 701–06, and 28 U.S.C. § 1361.

15.     Venue is proper in this District under 7 U.S.C. § 608c(15)(B), 28 U.S.C. § 1391(e), and 5 U.S.C. § 703 because Plaintiff resides and does business in Wisconsin and Western District of Colorado, and has its principal place of business in the Western District of Wisconsin.

16.     The FMMOs are also final agency action subject to judicial review under 5 U.S.C. § 704.

### III.     PARTIES

17.     CROPP Cooperative operates, and during the relevant period (beginning April 18, 2019, and ongoing) operated, at least one milk distributing plant within the meaning of 7 C.F.R. §§ 1000.4 and 1000.5 of the General Rules applicable to Federal Milk Marketing Orders, located at Chaseburg, Wisconsin and McMinnville, Oregon. Petitioner is, and during the relevant time period was, a "handler" as defined by 7 C.F.R. §§ 1000.9(a), 9(b), and 9(c).

5

4935-4500-1375v.4 0123896-000001

18.     CROPP Cooperative purchases organic milk from farms in the states of California, Colorado, Iowa, Idaho, Illinois, Indiana, Kentucky, Maryland, Maine, Michigan, Minnesota, Missouri, North Carolina, New Hampshire, New York, Ohio, Oregon, Pennsylvania, South Dakota, Utah, Virginia, Vermont, Washington, Wisconsin, and West Virginia.   CROPP Cooperative receives organic milk at its plants in Oregon and Wisconsin or directs organic milk to be received at its co-manufacturers' plants in California, Indiana, Minnesota, New York, New Jersey, Ohio, Oregon, Utah, Vermont, and Washington from both cooperative associations and independent dairy farmers.

19.     CROPP Cooperative is a certified organic handler.  CROPP Cooperative is certified for its handling scope under the United States Department of Agriculture ("USDA") National Organic Program ("NOP").  7 U.S.C. ch. 94, 7 C.F.R. pt. 205 (2025).  CROPP Cooperative's NOP ID is number 8150001357 .

20.     During the relevant period, CROPP Cooperative processed and packaged organic fluid milk for sale in intrastate, interstate, and foreign commerce for human consumption.  CROPP Cooperative did so at its own plants in Wisconsin and Oregon or through co-manufacturers.  As such, CROPP Cooperative has incurred and continues to incur obligations to the various Federal Milk Marketing Order producer-settlement funds pursuant to 7 C.F.R. § 1000.70.

21.     Defendant Brooke C. Rollins is the United States Secretary of Agriculture.  Defendant Rollins is sued in her official capacity only.  USDA is a duly organized agency of the United States.  In this capacity, Secretary Rollins has ultimate responsibility for activities at USDA, including the actions complained of herein.  Her governmental activities occur nationwide.

22.     USDA is a Department of the United States.  Its headquarters and principal place of business are at 1400 Independence Avenue, Washington, D.C. 20250.  Its governmental

6

4935-4500-1375v.4 0123896-000001

activities occur nationwide.  USDA, through the Agricultural Marketing Service, administers both the FMMOs and the NOP to which Plaintiff is subject.

## IV.    BACKGROUND

### A.    The Agricultural Marketing Agreement Act of 1937

23.    The AMAA authorizes the Secretary of Agriculture to issue "marketing orders," known as FMMOs, regulating the marketing and sale of agricultural commodities, including milk. 7 U.S.C. § 608c.

24.    The principal purpose of FMMOs is to bring forth an adequate supply of milk for fluid use (that is. Packaged milk used for beverages).  7 U.S.C. § 608c(18).

25.    To effectuate this goal, the AMAA further authorizes USDA to regulate raw milk prices under various FMMO regional milk marketing orders administered by a regional Marketing Administrator.  USDA has established eleven marketing areas (see map, paragraph 4) for the purpose of regulating the sale of milk.  For each area, USDA proposes the regulatory structure for the order, and then the dairy farmers (as noted above, called "producers") in that region vote to either adopt or veto the proposed order.

26.    Each marketing area is a geographic area where handlers compete for their sales, regardless of where the farm milk is produced.  7 U.S.C. § 608c(5); 7 C.F.R. pts. 1000–131 (2025). A handler is defined within the regulations generally as a processor of raw milk or a cooperative (an association of dairy farmers with full authority to market its members' milk).  Most dairy farmers market their raw milk to dairy handlers who process and/or manufacture the raw milk into dairy products.

27.    The AMAA requires milk and milk products to be classified by use and that minimum prices are "uniform as to all handlers, subject only to adjustments for . . . (2) the grade or quality of the milk purchased."  7 U.S.C. § 608c(5)(A).

7

4935-4500-1375v.4 0123896-000001

28.    USDA has developed four classes of milk products: bottled fluid milk (Class I), soft products (e.g., ice cream, cottage cheese, yogurt, etc., Class II), hard cheeses (Class III), and butter and powdered dry milk (Class IV).  USDA has never made an adjustment  in the minimum class or uniform prices for organic milk based on grade or quality, as permitted by the AMAA.

29.    The FMMO regulations use end-product price formulas to compute the minimum class prices.  USDA structures the formulas with the intent (and result) that the Class I price for fluid milk is almost always the highest price and the Class II, III, and IV prices are lower.  The price structure is purportedly designed to incentivize the supply of farm milk to fluid milk handlers over other uses of producer farm milk.

30.    The FMMO regulations mandate that fluid milk handlers (beverage milk, Class I) always participate in the producer settlement funds.  However, there is not a parallel mandate for manufacturing handlers (i.e., cheese, ice cream, butter, yogurt, nonfat dry milk, among others, Classes II, III, and IV)  to participate in the producer settlement funds and they typically participate only when it is economically beneficial to do so.  Thus, there are two types of FMMO handlers: fluid and manufacturing.

31.    FMMOs purport to bring forth an adequate supply of milk for fluid use through two mechanisms: (1) mandatory pricing and pooling schemes described above; and (2) requiring dairy farmers who wish to be eligible to receive pool payments from the producer settlement funds to satisfy performance standards designed to encourage shipments of milk to Class I plants.

32.    For example, the performance standards include tying a dairy farmer's participation in the producer settlement fund to commit to minimum shipments of milk to Class I handlers.  The purpose of the performance standards relevant to this lawsuit is to encourage suppling milk to the Class I market.  The performance standards are not specific to organic versus conventional milk.

33. USDA provides an example of this class utilization and pooling process below. Agric. Mktg. Serv., U.S. Dep't of Agric., *An Overview of the Federal Milk Marketing Order Program* 5 (2025), https://www.ams.usda.gov/sites/default/files/media/DairyFMMOBooklet.pdf. In this example, Plaintiff would be akin to the bottling plant that pays the $1.00 that goes into the pool instead of to Plaintiff's own supplier, "Farmer A."  USDA instead gives this money to a cheese plant for the benefit of the cheese plant's supplier, "Farmer B."



34. The above USDA example shows a simplified version of how pooling works.  The table above extends the example to all four classes of milk.

35. For each regional FMMO, USDA calculates the value of all milk associated with that order to establish a per hundredweight (abbreviated "cwt") uniform minimum price for producer farm milk.  USDA establishes the minimum class price for each class ("FMMO Price") and multiplies that by the total pounds of milk in that class.  The uniform price is the weighted

9

average price across the four classes (see table below).  In this example, as is typical for most months and regional pools, only the Class I price ($19.00) exceeds the uniform price ($16.70).  Thus, only Class I handlers pay into the pool, and then USDA redistributes that money to all other manufacturing handlers.

| FMMO Pool Computation | Utilization (%) | Milk (million lb) | FMMO Price ($/cwt) | FMMO Value (million $) |
|---|---|---|---|---|
| Class I (Fluid Milk) | 27% | 270 | $19.00 | $51.3 |
| Class II (Soft Products) | 9% | 90 | $16.20 | $14.6 |
| Class III (Cheese) | 54% | 540 | $16.00 | $86.4 |
| Class IV (Butter and Powder) | 10% | 100 | $15.50 | $15.5 |
| | | | | |
| **FMMO Pool Total** | 100% | 1,000 | | $167.8 |
| **Uniform (Producer Milk)** | | | **$16.78** | |

36.     The table above demonstrates with more detail how USDA takes the Plaintiff's property (primarily Class I dollars at $19.00/cwt less uniform price of $16.78/cwt, netting to $2.22/cwt) and then how it is ultimately distributed to (primarily) conventional farmers through pooling.

37.     Organic handlers suffer uniquely under this system for many reasons, but in particular because of the significant volume of organic milk in the Class I category compared to both conventional and FMMOs as a whole.  As demonstrated in the table below, 55% of organic milk is used in Class I as compared to 26% of conventional milk, meaning that organic handlers are paying into the producer settlement funds at a comparatively higher proportion than conventional milk handlers.

4935-4500-1375v.4 0123896-000001

|  | Conventional FMMO Utilization (%) | Organic FMMO Utilization (%) | Total FMMO Utilization (%) |
|---|---|---|---|
| Class I (Fluid Milk) | 26 | 55 | 27 |
| Class II (Soft Products) | 9 | 20 | 9 |
| Class III (Cheese) | 55 | 15 | 54 |
| Class IV (Butter and Powder) | 10 | 10 | 10 |
|  |  |  |  |
| Total / Weighted Average | 100 | 100 | 100 |

#### B.     The Organic Dairy Sector

38.     In 1990, as part of the 1990 Farm Bill, Congress established a separate USDA program for the certification of organic food production, including dairy products. Organic Food Production Act of 1990, 7 U.S.C. ch. 94 ("OFPA"). In December 2000, USDA published the regulations implementing OFPA and establishing the NOP, National Organic Program, 65 Fed. Reg. 80548 (Dec. 21, 2000); 7 C.F.R. pt. 205 (2025).

39.     OFPA and the NOP create a system by which both the production and processing of organic milk is subject to rigorous certified production methods and segregation to prevent the co-mingling of organic and conventional (i.e. non-organic-certified) milk. Certified organic milk production costs for organic dairy farmers and also for organic processing plants are substantially higher than conventional milk production and processing costs.

40.     These differing rules for organic versus conventional production all come with real and substantially increased costs for organic dairy farming versus conventional: (1) milk production per cow is substantially lower for organic than conventional; (2) feed and labor costs are higher than conventional production; (3) operational costs are higher than conventional production; and (4) herd replacements are more expensive than conventional replacements.

41.     These rules require organic cows to consume organic feed. Unlike conventional feed, organic feed requires: (1) land transition over three years from conventional to organic; (2)

11

restricted use of synthetic fertilizers, and a prohibition on use of pesticides, herbicides or GMO seed; (3) distinct boundaries and buffer zones; and (4) crop rotation.  7 C.F.R. §§ 205.202, .204, and .205 (2025).  The result of these requirements is higher upfront investment and operating costs to produce organic crops and lower crop yields per acre, all of which increase the cost of organic feed relative to conventional feed.

42.    Unlike conventional dairy farms, the NOP also regulates the actual care of organic cows.  The organic dairy herd health requirements include prohibiting the use of unapproved synthetic substances, as well as prohibiting hormones, pesticides, and antibiotics (similar to organic feed rules).  The organic system plan must include the use of preventive health practices which may not restrict the use of prohibited substances in order to preserve organic status of the animal.  An animal must be removed from the organic herd if treated with a prohibited substance. 7 C.F.R. § 205.238 (2025).  Organic herd health care is more labor intensive than for conventional, increasing the cost of production.

43.    Unlike conventional dairy farms, the NOP also mandates outdoor access for the organic herd, requires minimum time that organic cows are actually on pasture and minimum dry matter intake from pasture, provides housing requirements for cows, and proscribes physical alteration to cattle.  7 C.F.R. §§ 205.238–.239 (2025).  These requirements further increase the cost of organic milk production relative to conventional.

44.    In addition to increased production costs on the farm, organic milk also has a more costly supply chain as the farmers of organic milk consist largely of smaller farm operations, and organic farms are located at greater distances from organic handlers than their conventional counterparts.  Additionally, organic milk must always be transported by haulers in segregated tankers, and organic milk must be segregated from conventional milk at the processing facility.

4935-4500-1375v.4 0123896-000001

FMMOs do not recognize these significant systemic differences between conventional and organic milk costs.

45.    As a result, certified organic milk production costs for organic dairy farmers and organic processing plants are substantially higher than conventional milk production costs.

**C.    The FMMOs' Discriminatory Treatment of Organic Milk**

46.    USDA, through the Agricultural Marketing Service, administers both the FMMOs and the NOP.  Notwithstanding that USDA administers both, the two programs are separate and distinct.  The two programs operate pursuant to wholly separate enabling statutes (AMAA and OFPA) and regulations (7 C.F.R. pts. 205, 1000–131).  However, the establishment of the NOP coincided with the adoption of major amendments and implemented revised FMMOs effective January 1, 2000, in a process known as Federal Milk Order Reform, as required by Congress in the 1996 Farm Bill.  Order Amending the Orders, 64 Fed. Reg. 70868 (Dec. 17, 1999); 7 U.S.C. § 7253 (1996).

47.    The FMMOs have never provided support for the organic dairy sector by bringing forth an adequate supply of certified organic milk.  The FMMOs make no distinction between organic and conventional milk—even though federal law and USDA regulations prohibit organic milk processors from substituting or otherwise using conventional milk (i.e., non-organic certified milk) in their organic milk products.  7 C.F.R. §§ 205.100, .305, and .310.  General provisions that otherwise can encourage delivery of milk to handlers for fluid use (the  performance standards summarized in paragraph 32 above) do not specifically apply for certified organic milk.  *See, e.g.*, 7 C.F.R. §§ 1001.7 and .13.

48.    There are now 11 FMMOs regulating the sales of milk.  7 C.F.R. pts. 1001, 1005, 1006, 1007, 1030, 1032, 1033, 1051, 1124, 1126, 1131.

4935-4500-1375v.4 0123896-000001

49.     As explained in paragraphs 27 to 37 above, the FMMO system requires that all fluid milk handlers (Class I handlers) settle with the producer settlement funds at the minimum prices for their milk.  USDA then redistributes the proceeds of the producer settlement fund with voluntarily participating Class II, Class III, and Class IV handlers for the benefit of those handlers' supplying farmers.  7 C.F.R. §§ 1001.70, 1005.70, 1006.70, 1007.70, 1030.70, 1032.70, 1033. 70, 1051.70, 1124.70, 1126.70, and 1131.70.

50.     Under federal law and USDA regulation, organic milk processors cannot substitute or otherwise use conventional milk (i.e., non-organic-certified milk) in their organic milk products. 7 C.F.R. §§ 205.100, .305, and .310.

51.     Yet, FMMOs treat the products as interchangeable and make no distinction between organic and conventional milk to promote the availability of Class I milk packaged for use as beverages.  For example, since the FMMOs do not have performance standards for organic milk, they are unable to assist when organic milk supplies are insufficient.  As a result, the FMMOs do not, pursuant to the AMAA, bring forth an adequate supply of *certified organic milk* for fluid use, and moreover are not even intended to do so.

52.     Given the higher costs of production for organic milk, organic dairy farmers sell their milk to organic handlers at one milk price regardless of class utilization, that is regardless of whether the organic milk is used for Class I beverage milk or for Class II, III or IV manufactured products. The lowest farmer pay price for organic milk is typically much greater than even the highest minimum class price set pursuant to the FMMOs.

53.     Despite the higher prices organic handlers pay their own dairy farmer suppliers for organic fluid milk, organic handlers must also then pay a portion of what would otherwise be due to their dairy farmer suppliers into the producer settlement fund.

4935-4500-1375v.4 0123896-000001

54.     In addition to higher prices, organic milk gets utilized quite differently than all the milk as a whole subject to the FMMO program. A significantly larger portion of organic milk (approximately 55%) is utilized for fluid use (Class I) than the portion of conventional milk (approximately 26%) that goes to fluid use.  This disparity means that a greater proportion of organic milk is subject to mandatory participation in the FMMO system (as Class I milk) than conventional milk.

55.     Despite organic milk being disproportionately regulated in the FMMO system due to the high Class I utilization, it is a small share of overall farm milk production.

56.     As a result, due to the high Class I utilization of organic milk relative to conventional, organic milk handlers necessarily pay more into producer settlement funds at a higher rate than conventional milk handlers.  The payments made by organic handlers into the producer settlement fund are then distributed by USDA to other, mostly conventional, dairy handlers to benefit conventional dairy farmers.

57.     For over a decade, USDA has ignored requests from organic milk handlers to correct these failures of the FMMO system.  For example, in September 2015, an organic trade association (of which Plaintiff is a member) submitted a proposal requesting a hearing on the issue of relieving organic milk processors from some of the burdens of the FMMO system.  Federal law requires the Secretary to promptly act on any such proposal.  7 U.S.C. § 608c(17)(C)(i).  After requesting and receiving additional information supporting the request, USDA ignored its statutory obligations to either hold a hearing or deny the proposal, and failed to act for over 16 months. USDA never held a hearing on the proposal, let alone considered the FMMO amendments requested in the proposal.  After many months of USDA responding with form letters that it was "continuing to review" the proposal in violation of 7 U.S.C. § 608c(17(C)(i), the trade organization

15

withdrew the proposal on January 12, 2017 as being futile.  *See* https://www.ams.usda.gov/rules-regulations/moa/dairy/organic-amendment.

### 1. The 2024 Amendments to the FMMOs exacerbated the harm to organic fluid milk handlers.

58.    USDA is authorized to amend the FMMOs pursuant to 7 U.S.C. § 608c(17), utilizing formal rulemaking procedures pursuant to 5 U.S.C. §§ 556 and 557 (hearing notice and on the record hearing proceeding).  USDA can propose a marketing order or an amendment to the same in response to another person's proposal or *sua sponte*.  7 C.F.R. § 900.3(a) ("A marketing agreement or a marketing order may be proposed by the Secretary or by any other person.").

59.    In fact, USDA cannot presume the ongoing utility of the FMMO program and all of its facets; rather, it must, at every hearing and routinely of its own independent accord, continually ask and establish that each order serves the purposes of the AMAA.  If not, the AMAA requires that USDA terminate that order.  Specifically, if the Secretary concludes that any order "does not tend to effectuate the declared policy" of the AMAA, he or she "shall" terminate or suspend the order.  7 U.S.C. 608c(16)(A)(i) (emphasis added).

60.    In the spring of 2023, USDA received proposals from three non-party entities with proposed amendments to the FMMOs nationwide.  On June 1, 2023, USDA issued an invitation "providing the opportunity for interested parties to submit additional proposals regarding potential amendments to the current pricing provisions applicable to all FMMOs."  Dana H. Coale, Agric. Mktg. Serv., U.S. Dep't of Agric., *Invitation to Submit Proposals for Consideration in a Rulemaking Proceeding that may be Initiated to Amend all Federal Milk Marketing Orders* 1 (June 1, 2023), https://www.ams.usda.gov/sites/default/files/media/FMMOModernization_RequestforAdditional Proposals.pdf (emphasis added).  The invitation instructed that "[e]ach pricing related proposal

should be accompanied by a comprehensive explanation on the need for and potential impacts of the proposed change(s), how the proposed change(s) facilitates more orderly marketing, and any other relevant information." *Id.*

61.     In its Action Plan, issued on the same day, USDA stated it was "considering initiation of a rulemaking proceeding that would include a public hearing to collect evidence regarding proposed changes to pricing provisions effective in all eleven FMMOs." *Action Plan on Proposed Amendments to the Pricing Provisions of all Federal Milk Marketing Orders*, Agric. Mktg. Serv., U.S. Dep't of Agric. (June 1, 2023), https://www.ams.usda.gov/sites/default/files/media/FMMOModernizatino_ActionPlan.pdf (emphasis added).

62.     Many in the dairy industry responded submitting numerous proposals.  CROPP Cooperative joined with a number of other fluid milk processors to form a group called the Milk Innovation Group ("MIG").

63.     MIG submitted a proposal to exempt organic milk from certain pricing provisions, entitled "MIG Proposal 6."  **Exhibit 5.**  Specifically, MIG Proposal 6 sought to amend the pricing provisions so that they treat certified organic milk differently from conventional milk.

64.     MIG Proposal 6 expressly amended pricing provisions—that is, under MIG Proposal 6, certified organic milk would have to meet specific pricing constraints on a non-classified basis (at base, ensuring organic farmers were still receiving at least the minimum uniform price under the regulated system) and then would be eligible for an exemption from pooling.

65.     On July 24, 2023, USDA published the Hearing Notice, comprised of twenty-two proposals on various subjects including proposed amendments to all of the Class I, II, III and IV

17

pricing formulas.  But USDA did not include MIG Proposal 6 in the Hearing Notice.  Notice of Hearing on Proposed Amendments to Marketing Agreements and Orders, 88 Fed. Reg. 47396 (July 24, 2023); Hearing Ex. 1 (USDA 1), *In re Milk in Ne. & Other Mktg. Areas*, Nos. 23-J-0067, AMS-DA-23-0031 (U.S.D.A. Aug. 23, 2023), available at https://www.ams.usda.gov/rules-regulations/moa/dairy/hearings/national-fmmo-pricing-hearing/exhibits.

66.    That same day, USDA sent a response to MIG regarding its proposals.  **Exhibit 6**. USDA based its refusal to consider Plaintiff's organic milk exemption proposal on the claim that the organic exemption proposal "does not seek to amend the uniform FMMO pricing formulas" and therefore "does not fall within the scope of this hearing." *Id.* at 2.  USDA's claim is facially incorrect.  MIG Proposal 6 sought, explicitly, to amend the same pricing provisions of 7 C.F.R. § 1000.50 USDA had deemed worth consideration at the hearing.

67.    The hearing began on August 23, 2023.  At the outset of the hearing, pursuant to 7 U.S.C. § 608c(15), MIG objected to USDA's decision to exclude its pricing-related proposals regarding organic milk as being not in accordance with law.  Hearing Ex. 60 (MIG 1), *In re Milk in Ne. & Other Mktg. Areas* (Aug. 23, 2023), https://www.ams.usda.gov/sites/default/files/media/FMMO_MIG_1.pdf.

68.    The Administrative Law Judge ("ALJ") not only denied MIG's objection but refused to even engage with the substance of Plaintiff's objections to USDA's exclusion of the proposal: "The problem with the NAJ and MIG proposals were that the Secretary -- for me, is that the Secretary has already addressed those.  And who am I, yeah, a lowly ALJ, to define that the Secretary's wrong or the Secretary ought to reconsider something on that."  Hearing Tr. 2300:3–7, *In re Milk in the Ne. & Other Mtkg. Areas* (Sept. 6, 2023), https://www.ams.usda.gov/sites/default/files/media/FMMOtranscript090623.pdf.

18

69.    The ALJ reiterated this position in a subsequent written order, denying the objection on the basis that he lacked the authority to overrule the Secretary in this regard:

> [T]he Deputy Administrator specifically determined that the MIG [proposal is] beyond the scope of the hearing I am charged with conducting.
>
> . . . I find no basis for me to find that I have authority to make a ruling to the contrary to the Deputy Administrator's determinations of the scope of this proceeding.  Rather, it is my duty to enforce those determinations as made by the Administrator, via the Deputy Administrator, under authority delegated by the Secretary.
>
> . . . I do not find a provision under which I am authorized to substitute my judgment for the clearly expressed judgments of the Secretary's delegates.

Order Denying Requests to Consider Additional Proposals at Hearing, *In re Milk in Ne. & Other Mktg. Areas*, at 7–9 (Dec. 12, 2023) https://www.ams.usda.gov/sites/default/files/media/ 2_23_J_0067_OrderDenyingRequeststoConsiderAdditionalProposalsatHearing.pdf.

70.    Plaintiff, via MIG, presented evidence throughout the hearing that the FMMOs failed to meet the purposes of the AMAA with respect to organic milk.

71.    The hearing concluded on January 30, 2024.  Post-hearing briefs were submitted by April 1, 2024.

72.    MIG continued to oppose the new rules during the formal rulemaking process and in briefing.  MIG objected that the proposed rules did not effectuate the purposes of the AMAA.

73.    USDA issued a Recommended Decision on July 1, 2024.

74.    Hearing participants submitted comments on the Recommended Decision by September 13, 2024.  Plaintiff, through MIG, timely submitted comments and exceptions to the Recommended Decision setting forth the due process, non-delegation, and APA arguments and claims made in this Complaint.

4935-4500-1375v.4 0123896-000001

75.    USDA issued the Final Decision and Proposed Rule on November 12, 2024, submitted the Proposed Rule to a farmer referendum (supported by conventional dairy farmers including bloc voting by conventional dairy farmer owned cooperatives) pursuant to 7 U.S.C. § 608c(19), and issued the Final Rule January 17, 2025, effective for milk delivered on and after June 1, 2025.

76.    In the Final Rule, USDA ignored the organic milk-specific arguments made by Plaintiff, dismissing its submitted evidence and arguments in two sentences.  "[O]pponents argued Class I prices cannot be amended until the FMMO system is modified to recognize the organic milk sector.  However, potential amendments that would adopt disparate treatment of organic milk were not within the scope of this proceeding, as defined in the hearing notice."  Final Decision on Proposed Amendments to Marketing Agreements and Orders, 89 Fed. Reg. 95466, 95526 (Dec. 2, 2024)

77.    As part of a new "modernization" package, the revised FMMO regulations will significantly increase the burden imposed on organic Class I handlers like Plaintiff.  Uniform Pricing Formula Provisions, 90 Fed. Reg. 6600 (Jan. 17, 2025).  The new rules simultaneously increase Class I prices while decreasing Class II, III, and IV prices.  Mathematically, this significantly increases the producer settlement fund payments made by Plaintiff which  in turn are redistributed from Plaintiff's supplier farmers to other, mostly conventional dairy interests.

78.    For the calendar years April 2019 to March 2025, Plaintiff (directly or through its co-manufacturers as 7 C.F.R. § 1000.9(a) or .9(b) handlers under the FMMOs) paid more than $50 million into the producer settlement funds.  None of these funds were repaid to Plaintiff.  Nor were they paid in full (or even a significant portion) to organic farmers.  Rather, USDA transferred those funds to other handlers mostly for the benefit of conventional dairy farmers.  For 2025, accounting

20

for the new higher pricing rules effective June 1, 2025, Plaintiff estimates that it will pay sixty to sixty-five percent more into the producer settlement funds—despite repeatedly requesting relief from the unfair and unreasonable burdens of the FMMO system for at least a decade.

79.    Plaintiff is suffering or is likely to suffer irreparable harm in three forms.  First, USDA continues to unlawfully take these monies from Plaintiff every month, compounding the losses without reprieve.  Second, the recovery of unlawfully extracted payments are, in the first instance, recoverable from future producer settlement funds pursuant to 7 C.F.R. Section 1000.77 ("Adjustment of accounts").  Yet, the producer settlement funds pay out collected funds monthly and for the past two years have averaged a total unobligated balance of less than $10,000,000 per month.  This means Plaintiff's damages will exceed the value of those funds for significant time periods, making full recovery more complicated if not impossible.  Finally, the  deprivation of Plaintiff's U.S. Constitutional rights constitutes irreparable harm.

### 2.    The AMAA improperly delegates to farmers the power to veto FMMOs.

80.    The fact that the revised FMMOs will impose substantial harm on Plaintiff while providing no benefit to it is unsurprising given that the FMMOs are adopted through a farmer referendum.  Pursuant to 7 U.S.C. § 608c(19), a proposed FMMO must be approved by either:  (1) at least two-thirds of eligible farmers' votes; or (2) by the vote of farmers representing at least two-thirds of milk volume.  This allows farmers to approve or block USDA's actions proposing to set the prices and enforce the continued redistribution of milk payments.  Moreover, the numerical dominance of conventional farmers ensures that they can continue to force the minority group organic handlers like Plaintiff to subsidize their operations while USDA denies the intended benefits of the AMAA to organic handlers and farmers.

21

4935-4500-1375v.4 0123896-000001

## V.    CLAIMS

### CLAIM ONE
### UNLAWFUL TAKING WITHOUT COMPENSATION
### (U.S. Const. amend. V; 28 U.S.C. § 2201)

81.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs 1 through 80 of this Complaint as if fully set forth at length herein.

82.    The U.S. Supreme Court has expressly held that "there is no warrant for taking the property or money of one and transferring it to another without compensation." *R.R. Ret. Bd. v. Alton R. Co.*, 295 U.S. 330, 357 (1935).

83.    In 2015, the U.S. Supreme Court considered a similar situation involving raisin marketing orders. The Supreme Court reviewed the USDA's California Handling Order's raisin reserve-pool requirement whereby USDA sought a cash monetary penalty against a raisin handler due to the handler's refusal to participate in raisin pools. The Supreme Court held this system effected a taking in violation of the Fifth Amendment's Takings Clause for which just compensation was due. *Horne v. U.S. Dep't of Agric.*, 576 U.S. 350, 361 (2015).

84.    Just as in *Horne*, Plaintiff seeks to declare the FMMOs unlawful as to organic milk and recover just compensation for the taking of Plaintiff's allocable and specific producer settlement funds resulting from certified organic milk production subsequently taken by the USDA pursuant to the FMMOs' pooling provisions.

85.    Plaintiff possessed full legal or equitable title to the specific funds it paid to the producer settlement funds for the certified organic milk it purchased from organic producers taken by USDA for the benefit of other, mostly conventional, dairy industry interests.

86.    Plaintiff's identifiable and specific interest in the producer settlement funds it paid were property protected by the Fifth Amendment Takings Clause.

22

4935-4500-1375v.4 0123896-000001

87.     Through operation of the applicable FMMOs pooling and producer settlement fund provisions issued and enforced by USDA, title to Plaintiff's specific funds it paid to the producer settlement funds passed to USDA for the benefit of other, mostly conventional, dairy handlers and producers.

88.     These title transfers deprived Plaintiff of all property rights in the specific producer settlement funds paid by Plaintiff.

89.     The Market Administrators for each FMMO acted at all relevant times on behalf of the USDA.

90.     The Market Administrators provided Plaintiff no compensation when the market administrators appropriated for others Plaintiff's interest in the specific funds it paid to the producer settlement funds.

91.     The Market Administrators' appropriation of Plaintiff's interest in the specific funds it paid into the producer settlement funds without recoupment, constitutes a per se taking without just compensation and thereby violates the Fifth Amendment's Takings clause.

92.     Plaintiff is entitled to receive just compensation for the identifiable and specific producer settlement funds taken for certified organic milk purchased by it but held for and paid to other handlers for the benefit of other producers based upon the payments made by Plaintiff, as taken during the applicable statute of limitations period dating back from the date Plaintiff filed its 7 U.S.C. § 608c(15)(A) petition.

## CLAIM TWO
## VIOLATION OF DUE PROCESS
### (U.S. Const. amend. V; 28 U.S.C. § 2201)

93.     Plaintiff repeats and realleges each and every allegation set forth in the paragraphs 1 through 80 of this Complaint as if fully set forth at length herein.

23

94.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving a person of "life, liberty, or property, without due process of law."

95.    Plaintiff possessed full legal and equitable title to all amounts it has been and continues to be compelled to pay (either directly or through its co-manufacturers) into the producer settlement fund under the FMMOs, and all such monies constituted property protected by the Due Process Clause of the Fifth Amendment.

96.    The AMAA delegates authority to farmers to adopt FMMOs requiring payment into the producer settlement fund.

97.    The AMAA delegates this authority "uncontrolled by any standard or rule prescribed by legislative action." *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 122 (1928); *see also Eubank v. City of Richmond*, 226 U.S. 137, 143–44 (1912).

98.    USDA interprets the AMAA to permit farmers of conventional dairy products to vote on FMMOs with binding impacts on organic dairy farmers and organic handlers.

99.    Conventional dairy cooperatives and dairy farmers are motivated to adopt FMMOs imposing costs on organic handlers because of their own self-interest.  Conventional cooperatives and farmers receive funds from the organic handlers' contributions via conventional handlers' draws from the producer settlement fund.

100.    Given the higher Class I utilization of organic milk, conventional dairy farmers are further incentivized to vote to include organic milk in the FMMOs as organic milk contributes to the producer settlement funds at a higher rate than conventional handlers.

101.    The FMMOs' pooling and producer settlement fund provisions deprived (and continue to deprive) Plaintiff of title to those monies and passed that title through USDA and

24

4935-4500-1375v.4 0123896-000001

ultimately to the same farmers who adopted the FMMOs through the referendum process. As such, biased private parties exercised government regulatory power to deprives Plaintiff of its protected property interests and transfer that property to the biased private parties.

102. After farmers approve the FMMOs, USDA enforces their provisions and USDA's Market Administrators acted on behalf of USDA at all relevant times when effecting the deprivation and transfer of Plaintiff's property to farmers.

103. By allowing conventional farmers to vote to approve USDA's fixing of prices, establish payment obligations, and impose burdens on Plaintiff and other handlers through the FMMO referendum process, USDA violated the Due Process Clause of the Fifth Amendment to the United States Constitution. *See Roberge*, 278 U.S. 116; *Eubank*, 226 U.S. 137.

104. Plaintiff therefore is entitled to a declaration that the FMMOs' pooling and producer settlement fund provisions are unconstitutional and unenforceable both as mandated by the AMAA and as applied to Plaintiff.

## CLAIM THREE
## VIOLATION OF NONDELEGATION DOCTRINE
### (U.S. Const. art. I, § 1; 28 U.S.C. § 2201)

105. Plaintiff repeats and realleges each and every allegation set forth in the paragraphs 1 through 80 of this Complaint as if fully set forth at length herein.

106. Article I, section 1, of the United States Constitution vests the federal government's legislative power with Congress, and the nondelegation doctrine limits the extent of the authority that Congress can delegate to other branches of government or to private parties.

107. Here, the AMAA's farmer referendum provision grants a favored category of market participants—conventional farmers—veto power over each FMMO and the resulting obligations that federal law imposes on a disfavored category of market participants—handlers and organic farmers. Granting veto power to conventional farmers improperly transfers the

4935-4500-1375v.4 0123896-000001

government's discretion to unaccountable and self-interested members of the public and permits them to exercise that power to the detriment of other members of the public with directly adverse interests. As a result of this delegation, USDA's residual regulatory authority is limited to offering proposals that can muster the support of two-thirds of farmers regardless of the harm those proposed rules inflict on handlers like Plaintiff.

108. However, in *United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533, 577 (1939) ("*Rock Royal*") the Supreme Court held that the AMAA's referendum provision did not violate the nondelegation doctrine because granting regulatory veto power to private parties did not constitute a delegation of legislative power.

109. But even when it was decided, *Rock Royal* was inconsistent with existing precedent. Although the Court cited *Currin v. Wallace*, 306 U.S. 1, 5–6 (1939), that case only affirmed the constitutionality of a referendum process permitting tobacco growers in a particular region to vote to opt into a regulatory regime that would apply uniformly to all growers. The provision did not grant veto power over specific regulations, nor did it delegate authority to one group of favored market participants to approve policies that compelled disfavored market participants to make payments to the former—indeed, *Currin* distinguished earlier enactments that had been held unconstitutional on precisely those grounds:

> This is not a case where a group of producers may make the law and force it upon a minority (see *Carter v. Carter Coal Co.*, 298 U.S. 238, 310, []) or where a prohibition of an inoffensive and legitimate use of property is imposed not by the legislature but by other property owners (see *Washington ex rel. Seattle Trust Co. v. Roberge*, 278 U.S. 116, 122, []).

*Id.* at 15–16. Thus, the *Rock Royal* Court's reliance on *Currin* was misplaced, and it should have struck down the AMAA's referendum provision under *Carter* and *Roberge*.

26

4935-4500-1375v.4 0123896-000001

110. Moreover, *Rock Royal* is inconsistent with more recent Supreme Court decisions—and multiple justices have called for the decision to be revisited. Indeed, Justice Thomas described *Rock Royal* as "discredited and lack[ing] any force as precedent[]" because it is inconsistent with modern decisions "holding that a discretionary 'veto' necessarily involves an exercise of legislative power." *Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 90 (2015) (Thomas, J., concurring) (citing *INS v. Chadha,* 462 U.S. 919, 952–53 (1983)); *see also Chadha*, 462 U.S. at 987 (White, J., dissenting) (objecting that majority's view meant Congress could not grant itself the same "'veto' power" that private parties are allowed to wield under *Rock Royal*, "[a]ssuming *Currin* and *Rock Royal Co-operative* remain sound law"). Now that the Supreme Court recognizes the power to veto regulation constitutes an exercise of legislative power, the holding in *Rock Royal* is no longer tenable. *Rock Royal* should be overruled and the AMAA's referendum provision should be declared to be an unconstitutional delegation to private parties.

111. Finally, OFPA had not been adopted by Congress at the time of the *Rock Royal* decision. Thus, there was no meaningful context within which the Court could consider materially differently situated farmers of a commodity product like milk.

112. Plaintiff is therefore entitled to a declaration that the FMMOs' pooling and producer settlement fund provisions are unconstitutional under the nondelegation doctrine and unenforceable as applied to Plaintiff.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment:

1. On all claims, declaring that the FMMOs violate the United States Constitution and are unlawful and unenforceable as applied to Plaintiff;

2.    An award to Plaintiff of just compensation for the payments unlawfully required by USDA to be made to the producer settlement funds during the applicable statute of limitations period dating back from the date the Plaintiff's 7 U.S.C. § 608c(15)(A) was filed with USDA.

3.    Awarding Plaintiff its reasonable attorneys' fees pursuant to the Equal Access to Justice Act, costs, expenses, and disbursements; and

4.    Granting any further and additional relief the Court deems just and proper.

Dated: April 24, 2026                    /s/ Sarah A. Zylstra

Sarah A. Zylstra, State Bar No. 1033159
Boardman & Clark LLP
1 South Pinckney Street, Suite 410
Madison, Wisconsin 53701-0927
Telephone: (608) 283-1741
szylstra@boardmanclark.com

Ashley L. Vulin (*pro hac vice application forthcoming*)
Chris Swift (*pro hac vice application forthcoming*)
Davis Wright Tremaine, LLP
560 SW 10th Avenue
Suite 700
Portland, Or 97205
Telephone: (503) 241-2300
Chrisswift@dwt.com
Ashleyvulin@dwt.com

Charles English (*pro hac vice application forthcoming*)
Davis Wright Tremaine, LLP
1301 K Street Nw, Suite 500 East
Washington Dc 20005
Telephone: (503) 241-2300
Chipenglish@dwt.com

*Attorneys for Plaintiff*
*Cooperative Regions of Organic Producer Pools*
*dba CROPP Cooperative*

28

4935-4500-1375v.4 0123896-000001